[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs in the second of the above named cases brings this appeal from a decision of the defendant Board in sustaining a decision of the Wallingford Zoning Enforcement Officer (ZEO), Linda Bush, and dismissing the appeal of the plaintiffs from such decision. The plaintiffs had sought a ruling from the ZEO as to whether a tract of land owned by the City of Meriden but located in Wallingford was devoted to use as a solid waste disposal facility as a nonconforming use.
Previous Proceedings
 I.
On January 29, 1989, the plaintiffs, in the first of the above stated cases, brought an appeal to this court from a decision of the defendant Commission, denying an amendment to the Wallingford Zoning Regulations, which would have removed solid CT Page 620 waste disposal facilities from a list of uses prohibited in an Aquifer Protection District, as described in Article IV Section 4.12 of the Wallingford Regulations.
In that case, briefs were filed and the matter was assigned to the undersigned in September, 1989. Thereafter, the court held a preliminary hearing on the issue of standing. Counsel for the plaintiffs stated that the City of Meriden, between 1890 and 1945, had assembled a tract of land of 138 acres and that it proposed to lease a portion of such land to the plaintiff Authority (CRRA) for use as a solid waste disposal facility. It was further pointed out, without dispute, that a portion of the tract had been used as a dump or landfill prior to the adoption of zoning regulations by the Town of Wallingford. The issue of standing to appeal resolved into a determination of whether the plaintiffs were in fact aggrieved, i.e., whether (1) the plaintiff City was limited to use only that portion of the tract utilized for solid waste disposal, prior to zoning, as a protected nonconforming use, or (2) whether the plaintiff City had a right, arising out of the protection of nonconformities, to use the entire tract for solid waste disposal.
The court determined that such matters were factual in nature and required action by local zoning authorities in the first instance on the principle of exhaustion of administrative remedies. See Astarita v. Liquor Control Commission, 165 Conn. 185,190; Country Lands Inc. v. Swinnerton, 151 Conn. 27, 33.
Accordingly, the court stayed proceedings in the first matter and directed the plaintiffs to proceed to attempt to obtain the appropriate administrative rulings.
 II.
Thereafter, the plaintiffs, on February 22, 1990 requested a certificate of zoning compliance from the Wallingford ZEO, that the entire tract owned by the City was available for use as a solid waste disposal facility. The ZEO responded on March 14, 1990 that it was her opinion that the use of the premises as a solid waste disposal facility was a nonconforming use, and had been unlawfully expanded. She therefore refused to issue a certificate of zoning compliance. Counsel for the plaintiffs, by letter of March 28, 1990, requested further information as to the aspects of the landfill that constituted such expansion. There was no reply. The plaintiffs then appealed to the defendant Board which held a hearing on May 21, 1990 and thereafter voted to uphold the decision of the ZEO and dismiss the appeal. This appeal followed. Subsequently both cases were consolidated.
Aggrievement CT Page 621
The court held a hearing on both appeals on June 11, 1991. The court heard evidence on the issue of aggrievement from Robert Wright, executive vice-president of CRRA and C. Michael Aldi, City manager for the City of Meriden. In the second matter, the court finds the City as owner and CRRA as lessee are aggrieved and having standing to appeal. Bossert Corp. v. Norwalk,157 Conn. 279, 285; Primerica v. Planning Zoning Comm., 211 Conn. 85,94.
With respect to the first case, counsel for the defendant Commission argues that the plaintiffs were not aggrieved. Such claim was based upon a map (Exhibit A) offered during the court hearing, showing the site of the landfill, as it was purported to have existed as of the date when zoning was effective. Said exhibit is entitled "Landfill Closure Plan CRRA/Meriden Landfill, Meriden, Connecticut." Certain areas are identified by color code. An area colored yellow is identified as a site for closure of the landfill (See Sec. 22a-208, C.G.S.) It is clear that, notwithstanding the court's finding in the second case, the plaintiffs in the first case may be obligated to conduct certain activities as ordered by the Commissioner of Environmental Protections, which may constitute solid waste disposal activities barred by the aquifer protection regulations. The plaintiffs therefore have such an interest in being in compliance with such orders as will give them standing to challenge the regulations. See Hall v. Planning Commission, 181 Conn. 442. The plaintiffs in the first case are aggrieved by the Commission's action.
Scope of Review — (Zoning Board Case)
The Wallingford Regulations (Art. IX) (R. 29) provide for the establishment of a zoning board of appeals. "Once the board of appeals is provided for in the zoning ordinance, its powers stem directly from the statute . . . ." Langer v. Planning Zoning Comm., 163 Conn. 453, 458.
Under the statute (Sec. 8-6(1), C.G.S.), the board is empowered to "hear and decide appeals where it is alleged that there is an error in any order, requirement or decision made by the official charged with the enforcement of the zoning laws or any regulations adopted pursuant to them." Ibid.
"The essential purpose of a zoning board of appeals, so far as its power to grant variances under 8-6(3) of the General Statutes is concerned, is to furnish some elasticity in the application of regulatory measures so that they do not operate in an arbitrary, unreasonable or confiscatory manner, or in any manner which would be unconstitutional. (citations omitted). The power of the board to review, on appeal, under 8-6(1) of the CT Page 622 General Statutes, any decision of the zoning enforcement officer and, under 8-7, to reverse, affirm or modify that decision also supplies some measure of elasticity. Pascale v. Board of Zoning Appeals, 150 Conn. 113, 116, 186 A.2d 377. This power is vested in a zoning board of appeals, both to provide aggrieved persons with full and adequate administrative relief and to give the reviewing court the benefit of the local board's judgment.". . . Country Lands, Inc. v. Swinnerton, supra, 33.
When there is an appeal to a zoning board of appeals from a decision of the zoning enforcement officer under 8-6(1) and 8-7
of the General Statutes, the zoning board of appeals acts administratively, in a quasi-judicial capacity. Lawrence v. Zoning Board of Appeals, 158 Conn. 509, 514; Thorne v. Zoning Board of Appeals, 156 Conn. 619, 620. The zoning board of appeals has the authority to interpret the town's zoning ordinance and decide whether it applies in a given situation. Stern v. Zoning Board of Appeals, 140 Conn. 241, 245; Connecticut Sand Stone Corporation v. Zoning Board of Appeals, 150 Conn. 439,442; Lawrence v. Zoning Board of Appeals, supra, 515; Molic v. Zoning Board of Appeals, 18 Conn. App. 159, 165. On appeal, the court is not bound by the legal interpretation of the ordinance by the zoning board of appeals, Melody v. Zoning Board of Appeals, 158 Conn. 516, 518, since the interpretation of the ordinance is a question of law for the court. Danseyar v. Zoning Board of Appeals, 164 Conn. 324, 327; Thorne v. Zoning Board of Appeals, supra, 620; Miniter v. Zoning Board of Appeals, 20 Conn. App. 302,309.
Where the Board gives reasons for its decision on an appeal from a cease and desist order issued by the zoning enforcement officer, the question on appeal to the court is whether the reasons given are supported by the record and pertinent to the decision. Molic v. Zoning Board of Appeals, supra, 164, 165; Horn v. Zoning Board of Appeals, 18 Conn. App. 674, 676. The Board's decision must be upheld if even one reason is valid. Manchester v. Zoning Board of Appeals, 18 Conn. App. 69, 72, 73; Beit Havurah v. Zoning Board of Appeals, 177 Conn. 440, 444, 445.
The plaintiff challenging the administrative action has the burden to establish that the record does not support the action of the agency. Red Hill Coalition, Inc. v. Conservation Commission, 212 Conn. 710, 718.
The court is restricted to determining whether the Board's findings are reasonably supported by the record and whether the reasons given were pertinent reasons for the Board's action; the court cannot make its own determination on questions of fact and substitute its judgment for the findings of the agency. Horn v. Zoning Board of Appeals, supra, 674, 677. See also Molic v. CT Page 623 Zoning Board of Appeals, supra, 165; Connecticut Sand Stone Corporation v. Zoning Board of Appeals, supra, 442. Where there is a mixed question of fact and interpretation of the ordinance, the question is whether the zoning board of appeals correctly interpreted the ordinance and applied it with reasonable discretion to the facts. Toffolon v. Zoning Board of Appeals,155 Conn. 558, 560. The court cannot substitute its discretion for the Board's conclusion unless the decision was unreasonable. Id. 560, 561; Lawrence v. Zoning Board of Appeals, supra, 515.
On factual issues material to the reasons for the Board's action, the credibility of witnesses is within the province of the agency. Torsiello v. Zoning Board of Appeals, 3 Conn. App. 47,49; Spectrum of Connecticut, Inc. v. Planning and Zoning Commission, 13 Conn. App. 159, 163. Where there is conflicting evidence before the zoning board of appeals, a court cannot substitute its judgment for that of the Board. Horvath v. Zoning Board of Appeals, 163 Conn. 609; Westport v. Norwalk, 167 Conn. 151,161.
"A trial court cannot disturb a zoning board's factual finding . . . as long as that finding is the product of an honest judgment reasonably exercised." Marino v. Zoning Board of Appeals, 22 Conn. App. 606, 608. "The sufficiency of the evidence to support a finding, however, clearly presents a question of law." Zachs v. Zoning Board of Appeals, 218 Conn. 324,331.
When a zoning board finds that a nonconforming use has been illegally expanded, the issue is whether that finding is supported by substantial evidence. Zachs, supra p. 330.
"`This so-called substantial evidence rule is similar to the "sufficiency of the evidence" standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords "a substantial basis of fact from which the fact in issue can be reasonably inferred . . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.". . . "The `substantial evidence' rule is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention. It is broad enough and capable of sufficient flexibility in its application to enable the reviewing court to correct whatever ascertainable abuses may arise in administrative adjudication. On the other hand, it is review of such breadth as is entirely consistent with effective administration . . . . [It] imposes an important limitation on the power of the courts to overturn a decision on an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of `weight of CT Page 624 the evidence' or `clearly erroneous' action. . . ."'" Laufer v. Conservation Commission, 24 Conn. App. 708, 715. quoting Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 525, 541.
When a zoning authority assigns no reason for its action, the court has the burden of searching the record to discover sufficient reason to support the decision. Zieky v. Town Plan and Zoning Commission, 151 Conn. 265, 268.
Proceedings before the Defendant Board
On February 22, 1990, Hugh Manke, Esq., counsel for the plaintiff CRRA forwarded a letter to Linda Bush, the ZEO for the town of Wallingford, requesting that a certificate of zoning compliance be issued for the 138 acre tract of land, hereinbefore referred to, for use as a solid waste disposal facility. Attached thereto was a memorandum supporting the claim of CRRA and the City of Meriden to the effect that the use of said land for such purpose was a legally protected nonconforming use. (R. 1).
On March 14, 1990, said Bush responded that it was her opinion as ZEO "that the City of Meriden landfill located on Hanover Street in the Town of Wallingford is a nonconforming use. The landfill has been unlawfully expanded. I cannot issue a certification of zoning compliance." (R. 2).
On March 28, 1990, counsel for CRRA wrote to Bush, requesting "more specific information", and in particular "what it is about the use of the Meriden landfill that constitutes an expansion of a nonconforming use." (R. 3). There was no response. Counsel for CRRA requested a hearing before the defendant Board, which was held on May 21, 1990.
At such hearing, counsel for the CRRA appeared and made a presentation, which included remarks by Bruce Marks, the former Meriden Public Works Director, and Jeff Heidtman, a civil engineer. He also offered exhibits including copies of deeds to the City concerning the subject premises, a boundary survey (R. 6), and other documentation.
The Board also heard from Linda Bush as Town Planner and ZEO, who made a presentation including aerial photos, maps and other documentation.
Attorney Manke traced the history of the site as set forth in a memorandum he filed with the Board (R. 5). He submitted a series of deeds to the City of Meriden, (R. 8-15), concerning the site. (By stipulation in court the parties agreed that the Boundary Survey (R. 6) referenced said deeds for locating the CT Page 625 bounds of the property). Said deeds carry diverse dates from 1891 to 1946. He also offered a lease agreement (R. 7) and operating contracts between the City and CRRA (R. 20, 21 22).
The Boundary Survey map (R. 6) shows a parcel of land bounded northerly by the City of Meriden sewer treatment plant, easterly by the Quinnipiac River, south in part by Oak Street and in part by owners of private lands and westerly by Hanover Street. The southerly portion is subject to a right of way in favor of the Connecticut Light and Power Company, running from said Hanover Street to the Quinnipiac River and intersecting the northerly line of Oak Street. The right of way is 200 feet in width and about 2700 feet in length.
The parcel also appears to be subject to a right of way in favor of the Borough of Wallingford, 60 feet in width and running north from Oak Street to the Quinnipiac River. It is located in the south easterly portion of the parcel and crosses the aforesaid right of way to the Connecticut Light and Power Company. A storm drainage line runs southerly and easterly from Hanover Street to the Quinnipiac River, across the southerly portion of the parcel. Near the northwesterly corner of the parcel is shown a concrete pad transformer, a trailer and a one story aluminum frame structure enclosed by a chain link fence. The area as calculated to the apparent westerly high water mark of the river contains 142.01 acres. The map carries a note that no determination has been made as to whether the property line is the centerline or the high water line of the river.
Attorney Manke, in referring to a map (R.Q), stated that, in 1950, the Meriden sewage disposal plant was located just north of the Meriden — Wallingford Town line. The area to the south of the town line was used for sewage lagoons, and as the original dumping site. Further south, the area was used as a dump site for tree stumps, trimmings and logs. He further noted that Wallingford adopted zoning in 1958.
Attorney Manke then introduced an affidavit by Bruce Marks (R. 16), stating in part that he was employed by the City of Meriden from 1947 to 1980, and was involved in the operation of the landfill from 1947. He had served as acting City engineer and he was responsible for the operations of the Landfill Division of the Department of Public Works.
Mr. Marks then testified as to his experience with the use of the parcel and referred to a map, made by Fuss O'Neil, April 1987 entitled, "Landfill Closure Plan, CRRA/Meriden." (R. 26). He marked the sewage treatment plant as it existed in the 1940's as being on the right-hand border of the map. He also referred to a map (R. 28), an aerial photo, and marked the sewage plant as "SE". CT Page 626 The overflow sewage lagoons are shown as the green area on R. 26 and as "OB" on R. 28.
He stated that he marked an area on said map (R. 26) in orange as a portion of the site used for the dumping of the stumps, logs, tree trimmings and brush in the 1930's to 1940's. This is also shown as "IS" on R. 28. This area lies just northerly of the high tension wires. He further noted that he observed traces of oil dumped at about the same time in an adjacent area shown in red in said map (R. 26).
He indicated an area marked in purple on R. 26 as having been used for excavation of sand and disposal of sludge in the 1930's and 1940's. This area is shown as SW on R. 28.
He also stated that the principal solid waste disposal area, in the 1940's was located in the area marked yellow on R. 28 and "L.F." on R. 28, as it existed in 1951. After 1951, the solid waste area expanded easterly to the river and then southerly. Cover was provided by fill from the "SW" area. As each phase was covered, the process then moved westerly. Also at that time, the present process of compacting, cover and closure, i.e. use as a sanitary landfill, was established. The trees and shrubs lying between the river and the sewage lagoons were removed to accommodate the growth of the landfill. The landfill was utilized by Meriden and Wallingford residents.
In the 1970's, according to Mr. Marks, the sewage lagoons were eliminated with the building of a new treatment plant. He further noted that while he was public works director, he assured compliance with Department of Environment Protection regulations.
Attorney Manke also introduced two excerpts from the Meriden Municipal Register. R. 17, from the 1938 Register referred to the removal of sludge from the sewage beds, and collection of garbage and ash by the City. R. 18 from the 1951 Annual Reports of the City of Meriden referred to the dumping grounds in the vicinity of South Meriden being divided into two areas — one for the City garbage trucks and the other as a public dump. Attorney Manke also offered R. 18 as being a "hold harmless" agreement in 1980 between Wallingford and Meriden, relative to the establishment of a sand pit operation on land of the Meriden Airport to provide cover for the landfill and closing the existing sand pit on the Meriden landfill operation. The new location is shown on R. 27 as "BP" and the earlier sand pit is in the area marked SW on said exhibit.
The aforesaid exhibits (R. 17 and 18), above, described the trucks, scraper, and other equipment used by the City of Meriden to operate the dump. One bulldozer and a box scraper were CT Page 627 continuously employed in leveling refuse and covering it with sand. (R. 18).
Mr. Marks further testified that in 1951 it was the intent of Meriden officials to fill the entire area between the river and Hanover Street and from Oak Street to the sewage disposal plant.
Mr. Heidtman, the civil engineer, was questioned by the ZEO as to the meaning of an area marked by a dashed line on R. 28 (Landfill Closure Plan). He identified the area as the limit of the existing landfill — mixed solid waste — for which he was doing work for the city of Meriden. The legend of the map shows a heavy dashed line at an approximate elevation of 100 feet as "edge of proposed refuse" and a lighter dashed line at approximate elevation of 70 feet to be the approximate edge of existing refuse.
In summary, the exhibit (R. 26), from north to south, i.e. from the town line to the utility right of way, shows a yellow area, partly in Meriden and partly in Wallingford area, I identified as the original dump area; a large green area, identified as the sewage lagoons; a purple area, identified as the sand pit and sewer sludge deposit; a small red area identified as the location of industrial wastes which had been removed; and a large orange area southerly to the edge of the map, as the area where stumps, brush etc. which been dumped. The map also shows an access road to the orange area and to the sludge disposal area. These are identified as the uses in 1951.
The Board also received testimony from Linda Bush, the zoning enforcement officer (ZEO). She offered three aerial photographs showing the area in 1965, 1974 and 1985 (R.A, B C). On exhibit R.A, she identified the sewage lagoons, the river, the sand area and the landfill. She said she believed this represented the physical features in 1958. She referred to a saw mill shown on exhibit R.B that not shown in exhibit R.A.
She reviewed Attorney Manke's memorandum and suggested that the statement that the southern portion was a dumping site for bulky wastes, e.g. stumps, was not correct because such matter was deemed clean fill, until the advent of DEP.
She then referred to the statement as to the approval by Wallingford of a sand excavation pit in 1980, (R. 18, 19) and suggested that Meriden had proposed that it use the sand from the airport area for highway uses and not for landfill cover (R.B D).
She then disputed the attorney's statement that "Almost the entire 138 acre site was used in 1958 for waste disposal of one kind or another." She argued that there was a saw mill on the CT Page 628 site at one time, and introduced a letter (R.E) in support thereof. She then offered a map (R.F) purporting to show a lumber storage area in the southerly portion of the tract. The map is dated 1961. She further identified the sand pit on the premises, and referred to an aerial photo taken in July 1965. She also referred to the sewage lagoons as not being a landfill, and to a well shown on exhibit (R.B). She introduced on exhibit (R.H) a map purporting to show the sewage disposal beds.
She then suggested the tract is not suitable for landfill. She introduced a map (R.I) purporting to show that a portion of the site near the river was in a flood hazard area, and noted that a development permit is required for any development in the area. She introduced an inland wetlands map (R.J) and a stream encroachment map (R.K).
She then reviewed the history of zoning in Wallingford, from its origin in the Borough of Wallingford in 1952, to the adoption of the first code in April 1953. She offered a copy of the Zoning Map of 1953 showing the subject parcel to be in the RU-2 District, a Rural District in which were permitted residences, agriculture, kennels, private hospitals and private schools (R.B M). Such regulations provide in Section 11 in pertinent part thereof: "Any non-conforming use . . . legally existing at the time of the adoption of these regulations or any pertinent amendment thereto may be continued. . . ." She also noted that such regulations made it clear that the town "did not like the Meriden Landfill" (T. p. 18). She then noted that in November, 1958, the Borough and Town were consolidated, previous regulations were repealed and new regulations adopted. "That's why we call November 1958 our benchmark in zoning." (T. p. 38). Under the 1958 regulations, garbage and refuse incineration and dumping of matter not originating on the premises, except by the Town of Wallingford was prohibited. (R.N). The site was then placed in an RU-18 District which is not further defined.
Ms. Bush then gave her opinion as to why her decision should be upheld and offered a further legal opinion by Attorney Barbara Cox.
The Board also heard from a Mr. Gregory who described himself as a Wallingford resident of Yalesville but did not otherwise identify his residential address. He spoke in support of Ms. Bush's presentation, but offered no evidence on the issue at hand.
Attorney Manke offered rebuttal to certain issues raised by Ms. Bush. Mr. Marks stated that the well shown on R. 28 was used in the early 1960's during a period of drought. Mr. Heidtman stated that the disposal of sewage sludge is treated as a matter CT Page 629 of solid waste disposal by DEP.
Immediately following the close of the hearing, the Board voted to sustain the order of ZEO and to dismiss the appeal. (T. 53, 54).
It should be noted that Attorney Manke also introduced an affidavit from the present Director of Public Works of Meriden (R. 23) and an excerpt from the Meriden Municipal code (R. 24), as, to the operation of the landfill. He further offered a second affidavit from Mr. Marks describing the equipment used and the structures in existence at the landfill during the 1950's and the thereafter.
As noted in the record, the plaintiffs' ultimate purpose in these proceedings was to obtain evidence of local zoning compliance so as to qualify for a permit from DEP, pursuant to Section 22a-208b of the General Statutes. Accordingly, it was incumbent upon the plaintiffs to have demonstrated that solid waste disposal activities were being conducted in the site prior to zoning to such an extent as in order to qualify the entire tract as a nonconforming use.
 I.
SOLID WASTE
At the time of the plaintiffs' application to the ZEO, in February, 1990, "solid waste" was defined as follows (Sec. 22a-207, C.G.S.):
 (3) "`Solid waste' means solid, liquid, semisolid or contained gaseous material that is unwanted or discarded, including, but not limited to, demolition debris, material burned or processed at a resources recovery facility or incinerator, material processed at a recycling facility and sludges or other residue from a water pollution abatement facility, water supply treatment plant or air pollution control facility."
The plaintiffs' right to the determination of a nonconforming use must be determined upon the law at the time it made its application. Danbury v. Corbett, 139 Conn. 379, 383. Although the section was amended in the 1989 session of the General Assembly, "[A]n amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act." Shelton v. Commissioner, 193 Conn. 506, 514; Tax Commissioner v. Estate of CT Page 630 Bissell, 173 Conn. 232, 246.
Although the words "dumps" and "landfill" have appeared in the lexicon relating to discarded and unwanted materials, "solid waste" appears for the first time in the statutes in 1971.
As noted in the record (R.L), "Public Dumps" were excluded in the first enactment of the zoning regulations effective 1953. However, such regulations provided for the continuance of nonconforming uses (R.M). The 1958 enactment excluded "Garbage and refuse incineration or dumping of matter not originating on the premises, except by the Town of Wallingford." (R.N). The present regulations (R. 29) do not define "solid waste", but do define "Dumping" as the dumping of garbage, refuse or debris. The foregoing not withstanding, "solid waste disposal" is a prohibited use in the Aquifer Protection District (APD), Sec. 4.12 F.2. (R.W) In this matter the court is bound by the legislative definition. Toll Gate Farms, Inc. v. Milk Regulation Board, 148 Conn. 341, 347.
Public Act 845 of the 1971 Session of the General Assembly first defined "solid waste" and provided for the regulation of the facilities for the disposal thereof by the Health Commissioner. The authority created thereby was transferred to the Commissioner of Environmental Protection by P.A. 1 of the June 1971 Session.
In 1977, in Colchester v. Reduction Associates, Inc.,34 Conn. Sup. 177, the Superior Court (Allen, J.) held that the state had pre-empted the field of solid waste disposal as against the local zoning ordinance. The ordinance prohibited disposal of the type of waste that was permitted by DEP.
In 1978, the legislature amended the solid waste legislation by granting authority to localities to regulate land usage for solid waste through zoning. (P.A. 78-67). In 1985, the solid waste legislation was amended to require the applicant for a land solid waste permit to show zoning approval as a condition to the permit. (Now Sec. 22a-208b, C.G.S.).
Thereafter the Supreme Court addressed the state-local issues.
In Shelton v. Commissioner, 193 Conn. 506, the court found that by the enactment of P.A. 84-331, the local ordinance (Shelton) was pre-empted by state regulations as to land owned by CRRA, the co-plaintiff herein.
In Beacon Falls v. Posick, 212 Conn. 570, the court upheld two local ordinances adopted in 1954 which barred "dumping", as CT Page 631 against DEP regulations. Compliance with Sec. 22a-208a(b) was required.
On a related issue, i.e. principal vs. accessory uses, in D J Quarry Products Inc. v. Planning and Zoning Commission,217 Conn. 447, the defendant Commission, in 1990, enacted regulations to prohibit the processing of earth materials, excavated outside the subject town.
The plaintiffs were engaged in the mining and excavating of earth products. The plaintiffs claimed that their processing facilities using out-of-town materials constituted valid nonconforming principal uses. The Supreme Court ruled on whether the amendment was facially invalid and left it to the plaintiffs to prove in another proceeding whether their processing of out of town materials was a nonconforming principal use or whether the processing of such materials was accessory, on the premise that accessory uses must be located in the same lot and customarily incidental to the principal use.
 II.
NONCONFORMING USES
Whether the operation of a land solid waste facility on the subject premises is a valid non-conforming use is not in issue. The ZEO has admitted that the use is a valid conforming use as indicated in the record (R. 2). See Zachs v. Zoning Board of Appeals, 218 Conn. 324, 328.
The only issue before the court is whether there is sufficient support in the record for the contention that the use has been illegally expanded and that this expansion will bar the use of the entire tract for solid waste disposal. "`[The use] is permitted to continue until some change is contemplated by the owner, when, so far as expedient, the authorities take advantage of this fact to compel a lessening or complete suppression of the non-conformity.'" Thayer v. Board of Appeals, 114 Conn. 15, 24.
Section 8-2 of the General Statutes provides, in pertinent part, "Such regulations shall not prohibit the continuance of any nonconforming use, building or structure existing at the time of the adoption of such regulations."
Our Supreme Court has held repeatedly that elimination of nonconforming uses is a goal of zoning. See such cases as Woodford v. Zoning Commission, 147 Conn. 30, 33; Farr v. Zoning Board of Appeals, 139 Conn. 577, 587; Salerni v. Scheuy, 140 Conn. 566, 570.
Although the use of the particular language has not always CT Page 632 been uniform, the extension or change of a non-conforming use is generally prohibited, while an increase in the amount of business done or a change in the equipment used, has been deemed not to constitute a change of the use itself. Salerni v. Scheuy, supra p. 571. "There must be a change in the character of the use itself in order to bring it within the prohibition of the zoning ordinance."
"The legality of an extension of a nonconforming use is essentially a question of fact." Helicopter Associates, Inc. v. Stamford, 201 Conn. 700, 716, cited in Cummings v. Tripp, 204 Conn. 67,84. See also Chudnov v. Board of Appeals, 113 Conn. 49, 55.
By way of narrowing the issues in the light of the previous citations, it may be noted that the Board was not concerned with the following matters:
a. Whether the use, i.e. solid waste disposal existed at the time of adoption of zoning.
b. Whether the site has been continuously used for solid waste disposal.
 III.
CLAIM OF ZEO
The claim of the ZEO was that the use had been illegally expanded, and the court's function is to determine under what legal theory the ZEO was proceeding, and whether such theory has legal support and factual support in the record before the board. As noted supra, this analysis is made more difficult by the failure of the Board to state its reasons on the record. See Zachs, supra, p. 329.
Having admitted that the City of Meriden has a valid non-conforming use, the ZEO apparently argues that a non-conforming use may not legally expand. In her testimony (T. p. 27-48), she describes the various uses to which the tract has been put, and concludes at p. 40.
"I want to reiterate the main issues. Not all of this area was landfill. It was a sand pit; it was a drinking water well; it was a saw mill; it was sewage lagoons. To be a landfill the entire area must have been landfill. The land wasn't suitable for landfill. There were stream encroachment lines, wetlands, and floodplain on the property. To have a legal nonconforming use, the legal nonconforming use must be lawful, it must be in existence at the time of the regulations making it nonconforming, it must be known as such in the neighborhood and the use must be continuous, never abandoned, and its nonconformity may not be expanded. I CT Page 633 think that the Meriden Landfill has been expanded, that the area of 138 acres owned by the City of Meriden were not known in the neighborhood as a landfill — there were many other uses on the property, and obviously, when the gentleman from Fuss O'Neill drew the existing refuse area through the green areas on the map, which are the sewage lagoons, they have already expanded the area into the area of land on which areas were never landfill before. Wallingford has always opposed the landfill back as far as 1952."
As noted supra, the defendant Board made no findings of fact, nor did it state its reasons on the record. One member discussed the hearing matter briefly (T. p. 51, 52) but there is no indication the other Board members adopted her position. Welch v. Zoning Board of Appeals, 158 Conn. 208, 214, citing Thayer v. Board of Appeals, 114 Conn. 15, 20. See Zachs, supra, 218 Conn. 324,329. The sole action taken by the Board was to vote to uphold the decision of the ZEO and dismiss the appeal.
Accordingly, it is reasonable to assume that the Board accepted the factual matters set forth by the ZEO, supra to wit: that the tract contained a number of uses, and that the expansion of the landfill within the area of the sewage lagoons was an illegal expansion. The issue then is whether these facts and the legal conclusions drawn by the Board have the appropriate support in the evidence in the record. Grady v. Katz, 124 Conn. 525, 530; Zachs, supra. p. 331.
 A.
The ZEO, in her testimony, points out four uses that the subject tract contained from time to time, in addition to the landfill, to wit, sand pit, drinking water well, saw mill and sewage lagoons.
Anderson, "American Law of Zoning" 3rd Ed. 18.15, contains a glossary of terms, which contains sample definitions of the terms used in zoning ordinances or the courts. Included therein are (1) principal use, (2) accessory use and (3) temporary use.
"Principal use" is defined as "the primary purpose or function that a lot serves or is intended to serve."
"Accessory use" is defined as: "a use incidental to and subordinate to the principal use or located on the same lot with such principal use or building."
"Temporary use" is defined as: "a use of land, buildings or structures not intended to be of permanent duration."
It should first be noted that the original zoning regulations CT Page 634 do not contain any of the aforesaid definitions. (R.M N).
As to the matter of the sand pit, it should be noted that such an operation is regulated by the original regulations (R.M). See Section 8. Such section allowed the issuance of permits not to exceed two years and requires cover and seeding at the conclusion of the operations. Subsections 8.3.3 and 8.3.7. Such an operation clearly falls into the temporary use category. Further, such sand was used in part for cover of the landfill, and as such would be accessory thereto.
In the matter of the well, a fair reading of the regulations fails to disclose where such is a use regulated therein. Compare Silitscha v. Grossbeck, 12 Conn. 57, 62, 63, holding that subsurface septic systems are not subject to zoning regulations. Further, as Mr. Marks pointed out, the well was sunk in the 1960's after zoning became effective and was used only for the then existing periods of drought; hence, a temporary use.
The evidence before the Board was that the sawmill came into operation in the 1960's. As such it was a permitted temporary use as "forestry" (R.M, Section 5, subsection 5.1.2). There is no evidence that any request was made to establish a permanent operation as referred to therein.
As to the sewage lagoons, it should be clear that they constitute a use accessory to the sewage disposal plant, lying in Meriden. See discussion of principal use and accessory uses in J Quarry Products Inc., supra. In this instance, the principal operation was located in the plant in Meriden and the lagoons had no independent existence.
This leaves the issue of the status of the landfill. The Board concedes that the area marked in yellow on exhibit R. 26 constituted a portion of the tract used for solid waste disposal prior to any controlling zoning regulations.
The same exhibit shows an area colored orange that Mr. Marks testified was used for the dumping of stumps, brush, etc. which was defined by the ZEO. Dumping of industrial wastes is shown as colored in red and a large purple area was used for the deposit of sludge. From the foregoing evidence, it should be clear that the landfill operation was the principal use of the tract. There is nothing in the record to show the Board disputes such a conclusion. Since the issue of the principal use of the tract was raised by the ZEO, there is insufficient evidence to support any conclusion other than that the principal use of the premises was, at the adoption of zoning, and is, solid waste disposal. See Zachs, supra. p. 331. In furtherance of this issue, i.e., as to whether the tract was known as the Meriden Landfill, the record contains an excerpt from CT Page 635 the minutes of a meeting of the Wallingford Planning and Zoning Commission of June 9, 1980. (R.D) The matter concerned a proposal to widen Hanover Street between the two properties owned by the City of Meriden, i.e., the airport and the landfill, in conformance with a map prepared by the Wallingford Engineering Department. The discussion prior to approval of such map reads in part: "This is a good take of land, but you are giving up on the airport side, you are abandoning, and taking on the Landfill side. . . ." Such document constitutes evidence that the Wallingford Planning and Zoning Commission was aware and had been for some time that all of the City of Meriden property on the east side of Hanover Street was used as a landfill.
 B.
The second argument made by the ZEO and presumably adopted by the Board as the basis of its decision is that the expansion of the landfill with the area of the sewage lagoons was unlawful. The argument apparently then appears to be that by such unlawful expansion, the City has forfeited any right to expand its landfill elsewhere on the tract.
The ZEO offered, in support of the proposition that such expansion was illegal, a series of aerial photographs (R.A, B, C). R.A purports to show the entire subject tract and neighboring properties in 1965. R.B purports to show the same area in 1974 and R.C. the same area in 1985. She testified in connection therewith that the sewage lagoons were shown in exhibits R.A B but not on C. Her argument then runs that the expansion of the landfill from an area east of the lagoons into the lagoon area was an unlawful expansion.
Mr. Marks had earlier reviewed the history of expansion (T. p. 18, 19), referring to exhibits R. 27 28. With respect to the expansion of the landfill into the sewage lagoons, he testified that the sewage treatment plant was renovated in the early 1970's which eliminated the need for overflow beds. Such sludge beds were eliminated when a new treatment plant was constructed. He further testified that the landfill was operated in accordance with DEP regulations during his tenure. (T. p. 21).
The first issue to be determined is whether the claim of illegality is moot because no practical relief can be provided, as to whatever may have occurred between 1974, the date of the status of exhibit R.B, and 1985 (R.C). Evidence is undisputed that the area previously occupied by the sewage lagoons has been used for solid waste disposal since at least 1984. (R.C 29) Unless a decision on this matter can somehow affect the determination of this issue; the court is barred from deciding it. Phaneuf v. Commissioner of Motor Vehicles, 166 Conn. 449, 452. Clearly the, CT Page 636 ZEO is not seeking to have the sewage lagoon area returned to its previous use. Even were it to do so, the Court is without power to do SO for lack of appropriate parties, as well as being limited by the scope of this hearing. The defendant Board cites the court to no case where a claimed illegal extension of a non-conforming use of land is the basis of a bar for further expansion to other portions of the same site, otherwise legal. The area shown as actively being used for solid waste disposal substantially exceeds the area formerly occupied by the sewage bed (R.C 29).
Aside from the issue of mootness, there remains the matter of whether any such violation could have been enforced by local authorities. The time frame for the conversion of the beds was between 1974 and 1984 (R.B C).
In December, 1977, in the case of Colchester v. Reduction Associates, Inc., 34 Conn. Sup. 177, the Superior Court (Allen, J.) held that the enactment of legislation governing solid waste management in 1971 pre-empted local zoning. In response thereto, the legislature adopted what is now Section 22a-208(c) in the 1978 session to provide that a DEP solid waste permit did not override Board Zoning. As noted in Beacon Falls v. Posick, 212 Conn. 570,580, ". . . after Colchester, municipalities were without authority to enforce zoning regulations that conflicted with a DEP permit. . . ."
 C.
There remains the question of whether the entire tract shown on Exhibit A of the June 11, 1991 hearing may be used for solid waste disposal as a non-conforming use. It is not necessary that the non-conforming use as it existed at the time the zoning ordinance was adopted should have covered the entire tract in order that the owner could subsequently use it all. DeFelice v. Zoning Board of Appeals, 130 Conn. 156, 161 cited in State v. Szymanski, 24 Conn. Sup. 221-225 (Appellate Division of the Circuit Court).
The DeFelice case involved the question as to whether the installation of a sand classifier was an illegal extension of a non-conforming sand removal operation. The trial court found the following facts which were adopted by the Supreme Court:
1. Zoning was enacted in East Haven on September 4, 1936 (#1)
2. On January 27, 1941, the plaintiff purchased a 12 acre tract of land from one Page (#17)
3. Prior to enactment of zoning, said Page had extracted sand and gravel from a small section of said parcel (#30) CT Page 637
4. The subject parcel was located in a residential zone. (#3)
5. On July 9, 1941 the sand pit on the 12 acre parcel covered an area of approximately 90,000 sq. ft. (#16(b))
Records and Briefs, A-184 Finding p. 186.
The trial court dismissed the appeal from the Board, finding that the proposal was an illegal extension of the non-conforming use. In affirming the appeal, the Supreme Court noted:
 "In the ordinance quoted permitting the continuance of `non-conforming use existing', as was pointed out by the court in considering a similar enactment in Pennsylvania, `neither the extent, quantity nor quality of the use is mentioned, but only that it must exist', and `neither the act, the ordinance nor the law generally requires the court to speculate as to the number of acts or business transactions necessary to constitute an existing use' but, `as understood in the ordinance, "existing use" should mean the utilization of the premises so that they may be known in the neighborhood as being employed for a given purpose.' Haller Baking Co.'s Appeal, 295 Pa. 257, 261, 145 A. 77. As the court further suggested in that opinion, ordinarily this utilization for the conduct of a business in such a case as the one before us combines two factors: (1) the adaptability of the land for the purpose; (2) the employment of it within that purpose: and, as was also stated, the use need not be in actual operation at all when the regulations took effect. . . . (citations omitted). Nor is it essential that as exercised it shall have utilized the entire tract. . . . (citation omitted). Actual use as distinguished from merely contemplated use is requisite, however. . . . (citations omitted). Under the definition in the Haller case the fact that improved and more efficient instrumentalities are utilized in pursuit of the use does not exclude it from the category of an `existing use', provided these are ordinarily and reasonably adapted to make that use available to the owner, and the original nature and purpose of the undertaking remain CT Page 638 unchanged. The following cases are illustrative of this proposition:. . . (citations omitted). In the following cases, where the nature and purpose were different from those of the original enterprise it was held that an extension of the "existing use" was involved: . . . (citations omitted). Within the principles of these decisions the plaintiffs are entitled to use power shovels and other such equipment in the removal of sand from the twelve acre tract, pursuant to the exercise of their right to continue their nonconforming use of the land as a source of supply for sand. This accords with the original nature and purpose of their use of the property." (Emphasis added).
It should be noted that the East Haven ordinance in DeFelice provides that, subject to certain limitations not applicable in this case, "any non-conforming use existing at the passage of the regulations may be continued." The court noted its similarity to that in the Haller case (p. 161). The original Wallingford regulations, Section 11 in R.M, contains similar language, as to non-conforming uses. The present regulations effective in 1985 codifies the same provision. See Sec. 1.1 of R.W. Section 6.13, Non-Conforming Uses Buildings and Lots — makes no mention of non-conforming uses of land.
In State v. Szymanski, supra, the issue was whether the parking use of a lot adjacent to a junk-yard business was an illegal extension. In fact it was not, the Court noted at pp. 224, 225:
 Nonconforming uses are exceptions to the general principle of zoning that certain uses should be confined to certain localities, and it is the policy of the law not to extend them but to reduce them to conformity as completely and as speedily as possible with due regard to the interests of the parties. . . . (citations omitted). But this principle does not apply to an increase in the amount of use; the use may be increased in extent by natural expansion and growth. Salerni v. Scheuy, supra., 571, Guilford v. Landon, 146 Conn. 178, 182; Nyburg v. Solmson, 205 Md. 150, 161; Humphreys v. Stuart Realty Corporation, 364 Pa. 616, 621. `Once it. . . [has been] determined . . . that a nonconforming use existed, natural development and growth cannot CT Page 639 be paralyzed by an overly technical appraisement of the existing use. An ordinance which would allow the housing of a baby elephant cannot evict the animal when it has grown up . . . . If we were to prevent the natural growth and expansion of a protected nonconforming use, we would invade the constitutional guarantees of due process which indeed brought the nonconforming principle into being." Upper Darby Township Appeal, 391 Pa. 347, 353. "Ordinarily businesses either grow or shrivel up. They seldom stand still.' McMahon, v. Board of Zoning Appeals. 140 Conn. 433, 441. Nor is it necessary that the nonconforming use as it existed at the time the zoning ordinance was adopted should have covered the entire tract, in order that the owner could subsequently use it all" citing DeFelice, supra, (emphasis added).
The Upper Darby language was discussed in a recent Pennsylvania case, dealing with the issue at hand, to wit, whether a landfill may be expanded to the boundaries of the original tract. In Chartiers Tp. v. W.H. Martin, Inc., 518 Pa. 181,542 A.2d 985, the court noted as follows, at pp. 988-989:
"The principles governing the increase or expansion of nonconforming use are set out below.
In 1927, this Court first enunciated what is now commonly known as the `natural expansion doctrine', wherein we held that to a certain extent a nonconforming use can expand as a matter of right. The Court, addressing a business' attempt to build storage space, stated:
[the] business had been established at its present location long before the passing of the zoning ordinance and was actively conducted at the time the ordinance went into effect; accordingly, as the property was then used for lawful purposes, the city was without power to compel a change in the nature of the use, or prevent the owner from making such necessary additions to the existing structure as were needed to provide for its natural expansion and the accommodation of increased trade, so long as such additions would not be detrimental to the public welfare, safety and health.
Gilfillan's Permit, 291 Pa. 358, 362, 140 A. 136, 138 (1927). . . . (citations omitted).
Later, in Cheswick Borough v. Bechman, 352 Pa. 79, 42 A.2d 60
CT Page 640 (1945), the operators of a sand and sand loam business sought to extend their operations in depth and area. In determining that this extension of the business was proper, this Court stated:
The business carried on was the excavation of loam and sand loam. It is not essential that the use, as exercised at the time the Ordinance was enacted, should have utilized the entire tract. To so hold would deprive [the owners] of the use of their property as effectively as if the Ordinance had been completely prohibitive of all use. This result could not have been intended . . . In Humphreys v. Stuart Realty Corporation, 364 Pa. 616, 73 A.2d 407
(1950), we also stated:
that a non-conforming use cannot be limited by a zoning ordinance to the precise magnitude thereof which existed at the date of the ordinance;. . . neither is it essential that its exercise at the time the ordinance was enacted should have utilized the entire tract upon which the business was being conducted. . . . (citations omitted).
Furthermore, this court has held that a change in instrumentality will not defeat the purpose or existence of a nonconforming use.
Neither the natural growth of a business, existing at the time of the enactment of a zoning ordinance, nor adoption thereafter of more modern instrumentalities, suitable and helpful in carrying on the business, works a change of use in legal contemplation. . . . (citations omitted).
Thus, once it has been determined that a nonconforming use is in existence, an overly technical assessment of that use cannot be utilized to stunt its natural development and growth. As Mr. Justice Musmanno aptly stated, "[a]n ordinance which would allow the housing of a baby elephant cannot evict the animal when it has grown up, since it is generally known that a baby elephant eventually becomes a big elephant." Upper Darby Township Appeal,391 Pa. 347, 354, 139 A.2d 99, 102 (1958).
Given these parameters it would seem as a matter of zoning law, that Chambers had an absolute right to increase the daily volume of intake, and to utilize the east valley, without the necessity of obtaining a variance. This is so because Chambers was not changing the intended use of the property, and was not expanding the use beyond the area which was contemplated for such use at the time the landfill became nonconforming." Cited in Anderson American Law of Zoning, 3d Ed. 6.50.
The theory of "natural expansion" appears to have its genesis in a note in 102 U.Pa. L. Rev. 91, "Nonconforming Uses", which CT Page 641 cited Gilfillan, supra for authority.
The principle of "natural expansion" has been followed as a matter of zoning law in several jurisdictions e.g. New Hampshire, cf. New London Land Use Assn. v. New London Board of Adjustment,130 N.H. 510, and Maryland County Comsrs.v. Zent, 86 Md. App. 745, 587 A.2d 1205, in the context of being consistent with intensification.
Other jurisdictions have adopted the principle in the context of the "diminishing asset" concept. In a case involving a quarry, Moore v. Bridgewater Tp., 69 N.J. Super. 173 A.2d 430, that court noted at page 438 of 173 A.2d.:
"The author of the note in 102 U.Pa. L. Rev. 91 (1953) is of the opinion that the "diminishing asset" theory is merely another way of expressing the natural expansion theory. The author summarizes his views thusly:
". . . Apparently under either the strict limitation or the natural expansion doctrine, insubstantial renovations or extensions are permissible, although even here strict limitations as to cubic footage have sometimes been imposed. When the existing use involves unimproved land, such as is the case with extraction, under the natural expansion theory the whole lot is considered to be in use from the beginning and operations may be extended accordingly. . . . (emphasis added).
The case involved the question of whether the quarry activity was limited to a two acre site in operation.
The court held for the property owner, citing concurrence with courts in Minnesota, Illinois, and California. As cited supra, in DeFelice, our Supreme Court ruled that the sand and gravel excavation could extend to the entire 12 acre tract although only two acres were utilized the time of adoption of zoning. The Pennsylvania Supreme Court has recognized a land fill as likewise having a diminishing asset characteristic, Chartiers Tp supra, p. 990, noting that a landfill has a limited life, hence value, as a function of its capacity.
In the Zachs case, supra, our Supreme Court notes at page 332:
 "In deciding whether the current activity is within the scope of a nonconforming use consideration should be given to three factors: (1) the extent to which the current use reflects the nature and purpose of the original use; (2) any differences in the character, nature and kind of use involved; CT Page 642 and (3) any substantial difference in effect upon the neighborhood resulting from differences in the activities conducted on the property." (citations omitted).
While this court cannot weigh the evidence before the Board, Burnham v. Planning and Zoning Commission, 189 Conn. 261, 266; the sufficiency of the evidence to support a finding of fact is a question of law. Zachs, supra, p. 331. Further, the reasonableness of any such finding is subject to review in this court. Jeffrey v. Planning and Zoning Board, 155 Conn. 451, 454.
The evidence before the Board shows the status of the tract prior to zoning. (R. 26). Exhibits R.C and R. 29 show that the solid waste disposal activity has expanded southward so as to reach the bulky waste (brush, stumps, etc.) area shown on exhibit R. 26. Exhibit R.F shows a "lumber storage area "lying partly in the utility right of way. As noted supra, such use was classified at the time as a temporary use, and cannot reasonably be found to affect the nature and purpose of the tract.
The issue, of course, is whether utilizing the balance of this tract southward of the solid waste area as shown on Exhibits R.C and R. 29 is within the scope of a non-conforming use. Under the rationale of DeFelice and Szymanski, supra, there is no substantial evidence that the use of the balance of the tract would not be in keeping with the nature and purpose of the original use.
Nor is there any substantial evidence of any difference in the character, nature or kind of use. While different equipment may now be in use, there is no evidence that any such come within the proscription of DeFelice.
On the issue of any difference in effect upon the neighborhood resulting either from the expansion of the area utilized, or from the proposed utilization of the balance of the state, the ZEO offered the testimony of Mr. Ronald Gregory. He identified himself as a lifelong resident of Yalesville. Although "Yalesville" appears in the record, (See R. 9, a deed describing a portion of the the tract as being in the northwesterly part of Yalesville); neither its boundaries, nor Mr. Gregory's home address appears in the record.
The Board did not discuss Mr. Gregory's testimony. However, a careful reading of his testimony discloses no evidence of any adverse impact of either the existing landfill nor the proposed expansion on the neighborhood. The evidence before the Board shows the parcel to be bounded by the sewage disposal plant on the north, the Quinnipiac River on the east and the airport on the CT Page 643 west. The parcel is bounded on the south by residential properties on Oak Street. However, such properties are separated from the balance of the site by a utility easement, 200 feet in width (R.F). While neighborhood is an "imprecise concept" (Williams v. Liquor Control Commission, 175 Conn. 409, 412), there is nothing in the record to indicate the "neighborhood" extended further than Oak Street on the south. Mr. Gregory spoke about impact the Meriden Landfill has on Wallingford residents in Wallingford." In short, there is nothing in the record to show any adverse effect on the neighborhood if the solid waste area were to extend to the balance of the subject parcel. Zachs, p. 333.
It should be noted that the record shows in exhibit R.D that, on June 9, 1980, at a hearing to discuss realignment of Hanover Street at the landfill site, there was no comment at all from anyone other than commission members.
The Board states in its brief that the tests in Zachs are applicable to this case. There is no substantial evidence in the record to warrant a finding that the use of the balance of the parcel in question would not be within the scope of a non-conforming use. Zachs, p. 332.
It is noted that the defendant raises several points in its pre-trial brief that must be addressed.
The defendant cites DeFelice for the proposition that the court found that the expansion of the sand pit "would eventually convert the existing sand pit . . . into a permanent deep pond or lake covering the entire twelve acre tract." Brief, pp. 13, 14. The quote contains an ellipsis. The language referred to in pertinent part at p. 163 reads as follows:
"The court found that . . . the wet sand classifier by its erection and operation would. . . eventually convert the existing sand pit with its total area of ninety-thousand square feet into a permanent deep pond or lake covering the entire twelve acre tract." As noted supra, the Supreme Court then refused to allow new machinery but did rule that the plaintiff could use the entire 12 acre tract.
The defendant alleges at page 15 that the Chartiers case is distinguished from the instant case because therein the zoning regulations of the town expressly permitted expansion of non-conforming uses, citing, p. 988 n. 2 at 542 A.2d. The note does quote a regulation providing expansion by variance. The plaintiff claimed the defendant was in violation of such regulations. The holding of the court (p. 989) was that the defendant "had an absolute right . . . without the necessity of obtaining a variance." CT Page 644
The defendant further cites, at p. 18, that the land fill is in violation of flood plain regulations in the zoning regulations. Suffice it to say that such regulations, like the APD regulation, were adopted after the plaintiff established its non-conforming use.
The defendant also cites a lack of an instant wetlands permit. Such regulation is governed by Chapter 440 of the General Statutes, Zoning is governed by Chapter 124.
In its reply memorandum, the defendant challenges the claim in the plaintiff's brief that the current zoning regulations do not prohibit a change in use of unimproved land (p. 12). careful reading of Section 6.13 confirms the plaintiff's interpretation. Subsection a Non-conforming Use, reads as follows "Non-conforming use of a building (etc.). . ."" No mention is made of a non-conforming use of land as set forth in the earlier regulations. See R.N.
In summary, neither the legal non-conforming use of the land for solid waste disposal nor the extent of the tract owned by Meriden is in dispute. Applying the principles of law as noted, the court finds there is insufficient evidence in the record to support the decision of the board upholding the ruling of the ZEO denying that the entire tract as shown in Exhibit A supra may be used for solid waste disposal.
The appeal is sustained. The decision of the Board is reversed and the matter is remanded to the defendant Board with an order that it proceed in the matter according to law. Bogue v. Zoning Board of Appeals, 165 Conn. 749, 756.
Appeal From Commission
In the appeal from the action of the Wallingford Planning and Zoning Commission, (Commission), the plaintiffs ask the court to reverse the refusal by the said Commission to remove subsection F.2 from Section 4.12 of the Zoning Regulations, entitled "Aquifer Protection (APD) District". Said section provides, inter alia, that such District shall be superimposed over the primary and secondary recharge areas of the Quinnipiac River Aquifer and the Muddy River Aquifer. The mapping of such district shows it to contain such aquifers as well as the area of the landfill owned by the defendant City of Meriden.
Subsection F of said section is entitled "F. Non-permitted Uses: . . . 2. solid waste disposal". The obvious impact of the enactment of this section of the zoning regulations was to exclude solid waste disposal as a permitted use for any property located in such District. Said section was enacted in 1983 and was CT Page 645 included in the codification of the 1958 Regulations adopted September 29, 1985. See R. 29.
As noted supra, the court has found the plaintiffs to be aggrieved by the refusal of the Commission to remove such prohibition from Section 4.12.
In their brief, the plaintiffs raise the following issues.
(1) The prohibition of solid waste disposal is in violation of Section 8-2 of the General Statutes, as being an exercise of the power to prohibit a legitimate use rather than the power to regulate.
(2) The local aquifer protection regulations are preempted by the legislation granting the Department of Environment Protection authority in the same field.
(3) The challenged regulation is not a reasonable exercise of the police power.
 I.
PROCEEDINGS BEFORE THE COMMISSION
In December 1988, the plaintiffs herein filed an application with the defendant commission, requesting an amendment to the APD regulations, that would remove solid waste disposal as a prohibited activity in such district. The defendant commission held a hearing on the application on January 5, 1989.
Attorney Hugh Manke appeared and made a presentation on behalf of the plaintiffs. In his opening statement, he noted that the request of the plaintiffs was the removal of the prohibition of solid waste disposal and the substitution of a permitting procedure. He argued that the prohibition was illegal in the light of a case decided by the Appellate Court (Beacon Falls v. Posick, 17 Conn. App. 17), and that it could be demonstrated that solid waste disposal activities could be compatible with the preservation of the purity of aquifers in the same area. (The ruling in the aforesaid case was subsequently reversed (212 Conn. 570)).
He then presented the testimony of Robert Potterton, a senior ground water hydrologist with the engineering firm of Fuss and O'Neill of Manchester. Mr. Potterton explained that his statement would consist of three parts: (1) compatibility factors; (2) how such factors relate to the Meriden landfill and (3) his proposed type of investigation. These matters related to aquifers that may supply certain wells of Wallingford located on Oak Street south of CT Page 646 the landfill. (See Exhibit A attached hereto).
On the first part, he offered charts to show the compatibility between a domestic septic system and a well on the same lot as an example of how multiple uses can co-exist within a limited land area.
He then discussed the natural factors of compatibility, to wit: (a) geology (b) hydrologic separation and (c) geographic relations. Thereafter, he discussed the manmade factors, listing them as (a) design, (b) monitoring, (c) active controlling systems, (d) water treatment and (e) closure of the site. He noted that this last item is most applicable to land disposal activities and calls for an impermeable cover that eliminates the generation of contamination by isolating the disposal site from the environment. He then offered an opinion that by proper controls in the above areas, successful multiple use of a resource is possible.
He then addressed the Meriden landfill and its existing and proposed use. The existing use consists of a bypass area and a bulky waste area, approximately 63 acres. A portion of such area is proposed for ash residue disposal. He also presented a cross-section of the landfill site showing two aquifers below the site. The upper aquifer is a shallow water table aquifer, below which is a layer of silt and fine sand. Below that is a coarse grained aquifer, beneath which is till and bedrock. He opined that the silt and fine sand constituted a barrier which prevented transmission of water from the upper to the lower aquifer.
He then discussed the hydrogeologic factors and noted that the ground water from the area flows into the shallow aquifer and discharges into the Quinnipiac River. He further noted a difference in water pressure (hydraulic head) that created pressure from the lower to the upper aquifer.
He then discussed the third factor — geography — and noted that a well within the land owned by the plaintiff City referred to as the Saw Mill well (see ZBA appeal, supra) was outside the geographic area of influence of the landfill.
Thereafter, he reviewed the proposed manmade controls. These included (1) a liner at the proposed ash residue area, (2) monitoring, which would include monitoring at the Saw Mill well, (3) use of the Saw Mill well as an interceptor well, i.e. to draw possible contaminants away from the drinking water source, (4) water treatment, some of which is presently being conducted and (5) closure. He pointed out that closure prevents rain water from getting into the residue and percolating into the ground waters. CT Page 647
He then discussed his proposed investigation of the factors on the site and the application of the foregoing principles thereto, and concluded that the proposed expansion of the site would be compatible with the Quinnipiac River aquifer system and that there was no location outside the APD where a landfill could be located. These opinions were based in part on extensive studies made by his firm, copies of which were filed at the hearing.
Attorney Manke then introduced a number of reports as well as copy of DEP regulations.
The Commission then heard comments from the Mayor of Wallingford and the Director of Public Utilities, Mr. Roy Smith, both of whom spoke against the proposal. Mr. Smith introduced two of his consultants, Oliver Poirier and Gary Parsons, of the firm of Whitman Howard, Inc. engineering consultants to the town. Mr. Poirier raised some questions as to Mr. Potterton's conclusions. He then commented "There are so many things that we can't really tell about what's going on in the ground, what's coming out of the landfill, where all the contamination is coming from." Mr. Parsons noted that his firm had reviewed the Fuss and O'Neil reports. He agreed that a new landfill must have a liner and urged that cover be placed immediately on the present landfill to eliminate a potential source of pollution.
Linda Bush, the City Planner, then spoke, and noted that the proposal would affect all aquifers, not just the Quinnipiac River aquifers. She noted that when the Commission adopted the APD regulation, there was almost no discussion, because the Commission was acting on a recommendation in the Plan of Development. She offered a copy of the Plan of Development as an exhibit. The pertinent part thereof reads as follows:
"To provide protection for existing and potential water supply sources by restricting uses and establishing controls in primary and secondary aquifer recharge areas to reduce the risk of contaminating groundwater quality.
Aquifer District — Restricted to uses which do not present undue risk of groundwater contamination and prohibiting or controlling those which do, such as, the use, storage, treatment; or disposal of hazardous materials including storage of road salts or de-icing compounds. The aquifer protection district would overlay the established pattern of land uses and guidelines would apply in addition to those for the particular use district. (The proposed Aquifer District is illustrated on a separate map following the Land Use Element plan map.)" R. 23 pp. 14, 16 (Map on page 15). CT Page 648
The Commission then heard from State Representative Mary Mushinsky, a member of the Environment Committee of the General Assembly, who recommended that the Commission allow the site to be used only for "bulky waste which is clean, demolition debris; things like sheet rock, brick and stumps." The Commission also heard from State Representative Mary Fritz, who presented a letter from an analyst at DEP.
The Commission also heard from several members of the public.
At the close of the hearing, after a short discussion the Commission voted to deny the application for two reasons:
(1) The existing amendment is in accordance with the town Plan of Development.
(2) Protection of the drinking water supply.
"Where a zoning authority has stated its reasons for a zone change, in accordance with General Statutes 8-3, the reviewing court ought only to determine whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations (citation omitted). The zone change must be sustained if even one of the stated reasons is sufficient to support it." (citation omitted). First Hartford Realty Corp. v. Planning Zoning Commission, 165 Conn. 533, 543.
When a commission denies an application for a change in the regulations, it is preferable to have its reasons stated for its actions. Calandro v. Zoning Commission, 176 Conn. 439, 441.
"The present appeal, involving a decision upon an application for a change of zone, required the trial court to review a decision made by the zoning commission in its legislative capacity. In such circumstances, it is not the function of the court to retry the case. Conclusions reached by the commission must be upheld by the trial court if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the agency (citations omitted). The question is not whether the trial court would have reached the same conclusion, but whether the record before the agency supports the decision reached." Calandro, supra, p. 440.
The question posed herein is whether the action of the Commission is a proper exercise of the police power as such power is related to a purpose of zoning; in this case, preservation of the public health by protection of public drinking water supplies, and accordingly, in the broader sense, the public welfare. CT Page 649
In Feinson v. Conservation Commission, 180 Conn. 421, the defendant Commission denied a request for an inland wetlands permit. The court noted that the commission relied heavily upon evidence offered by a commission member, while rejecting the only expert evidence — that of the plaintiff — in the record. It also noted that in a given case, expert testimony may be required (p. 428.) There is no claim here that the commission was relying on its own knowledge and expertise.
While, as in Feinson, a commission may reject the only expert evidence offered, the court may review the record to determine whether the commission acted reasonably. Daughters of St. Paul Inc. v. Zoning Board of Appeals, 17 Conn. App. 53, 57, 61.
It is well established that zoning regulations are to be construed strictly, and are not to be extended by implication. Planning Zoning Comm. v. Craft, 12 Conn. App. 90, 96.
As noted, supra, the Commission denied the requested amendment for two reasons: (1) compliance with the plan of development and (2) concern for the public health and welfare i.e. provision of drinking water.
As to the first ground, it is noted that the defendant Commission is both a Planning and a Zoning Commission. See Section 8-4a C.G.S. "Its duties in each category are separate but related. As a planning commission, its duty is to prepare and adopt a plan of development for the town based on studies of physical, social, economic and government conditions and trends and the plan should be designed to promote the coordinated development of the town and the general welfare and prosperity of its people . . . Zoning, on the other hand, is concerned with the use of property. . . . Comprehensive zoning should be based upon community planning." Purtill v. Town Plan Zoning Commission,146 Conn. 570, 571, 572.
A plan of development is properly called a master plan. Mott's Realty Corp. v. Town Plan and Zoning Commission, 152 Conn. 35,538. See Sec. 8-23 Connecticut General Statutes.
"Under the general law, the master plan does not control the zoning commission in its enactment of zoning regulations. The master plan in its designation of appropriate uses for various areas in a town is merely advisory." Dooley v. Town Plan and Zoning Commission, 154 Conn. 470, 473.
The master plan is to be distinguished from the comprehensive plan of zoning which is found in the zoning regulations themselves. See Levinsky v. Zoning Commission, 144 Conn. 117, CT Page 650 123. "Such a plan has been described as one which requires the zoning commission to shoulder the burden of `adopting the ordinance or amendment only after study and consideration of all the elements involved.'" Dooley, supra, 474 (Emphasis added).
As Ms. Bush states in the transcript (R. 28), p. 37, in referring to the adoption of the APD regulation, "there was virtually no discussion when we (sic) adopted it. The discussion, I believe, took place all back when the Plan of Development was adopted, because the district boundaries were adopted as part of the Plan of Development."
In Dooley, the court upheld a change of zone adopted by the commission in reliance on the recommendation in the master plan, citing the pertinent factors contained in the master plan, (p. 476). In the instant case, the master plan section refers to the prohibition or control of uses that present an undue risk of ground water contamination and cites specifically "use, storage, treatment and disposal of hazardous materials including or road salts or de-icing compounds." Solid waste disposal is not mentioned. There is nothing in the master plan provision to support any finding that the commission was aware that the Meriden landfill was a threat to the groundwater when it included such provision. Accordingly, although the commission adopted the district boundaries, there is no support in the record for its claim that prohibition of solid waste disposal was based upon the Plan of Development. There is nothing in the record that shows the commission considered whether a solid waste disposal facility, operating under the permits required by DEP, presented "an undue risk of ground water contamination."
The second ground of the commission's action is the protection of the drinking water supply in Wallingford. "Zoning regulations have been upheld as a legitimate subject for the exercise of police power provided it has a reasonable relation to the public health, safety and welfare and operates in a manner which is not arbitrary, destructive or confiscatory." Helbig v. Zoning Commission, 185 Conn. 294 304. "Every intendment is to be made in favor of the validity of an ordinance and it is the duty of the court to sustain the ordinance unless its invalidity is established beyond a reasonable doubt." Connecticut Theatrical Corporation v. New Britain, 147 Conn. 546, 553.
The court can find nothing in the record to support any finding that the commission in adopting the regulation considered any possible impact on the Oak Street wells or on any aquifer arising from the Meriden landfill. Clearly, these types of considerations call for expert evidence, Feinson, supra, as opposed to action taken on general land use questions where the commission can rely on its own knowledge. See e.g. Dram CT Page 651 Associates v. Planning Zoning Commission, 23 Conn. App. 538, 542.
Rather, the instant matter falls into the category of such cases as Builders Service Corporation v. Planning and Zoning Commission, 208 Conn. 267, where the Supreme Court found that a zoning regulation requiring a minimum size dwelling had no rational relation to public health and was therefore an invalid exercise of the police power, p. 306.
While the record is replete with expert testimony, reports and data offered by the plaintiffs as to why the inclusion of solid waste disposal as a prohibited use should not continue, the commission may, and presumably did, reject such evidence. Conversely, the commission cannot therefore assume the opposite to be true, in the absence of supporting evidence. This is especially true since the Commission had before it a copy of the regulations of DEP setting forth that the Commissioner may issue a solid waste disposal permit, only after considering all relevant factors as to possible pollution of the state's ground waters.
In its brief, the defendant commission cites a report prepared by Whitman Howard, consultants to the Wallingford Department of Public Utilities, dated March 14, 1988 (R 14). It cites, at page 5, that the landfill may be a source of contamination to the Oak Street wells. (Emphasis added) At pages8-10, it is noted that contamination came from several wells. At pages 15-16, the report notes that the contamination was probably due to the earlier dumping of liquid industrial waste and that the "landfill is one of many possible sources of volatile oil compounds (voc) in the Quinnipiac River." However, at page 52 of the same report, the Meriden Markham Municipal Airport is cited as a significant potential source of contamination. And, at page 53, it is noted that, "[T]he entire river valley is most likely contaminated to varying degrees with vocs."
It should also be noted that the report recommended, as a protection to the water supply, the town should consider suspending present landfill operations, and that a final cover of the existing landfill be instituted. This was confirmed by Mr. Parsons, the engineer, as an immediate first step in eliminating the landfill as a potential source of the problem (T. p. 33). However, since the plaintiffs cannot obtain a DEP permit because of the subject ordinance, it cannot conduct activities regulated by DEP, i.e. placing the aforesaid cover.
In order for a prohibition under the zoning laws to be valid, it must be "rationally related to the protection of the community's public health, safety and general welfare." Beacon Falls v. Posick, supra p. 583. In that case, the Supreme Court upheld a prohibition of solid waste disposal on the basis that the CT Page 652 presence of a dump would overtax the abilities of the town to cope with the problems which would arise from the operations of the dump. p. 585.
In determining whether there exists a rational relationship between the prohibition of the regulation and the protection of the public health, the court has considered:
(1) that the landfill is considered by the town's experts as only a possible source of contamination. The Commission, in its brief, cites the statement of Mr. Poirier (T. p. 29). "There are so many things that we can't really tell about what's going on in the ground, what's coming out of the landfill, where all the contamination is coming from." Since the Commission conducted no studies, prior to enactment of the regulation, to determine whether in fact there was a hazard to public health, the record herein is insufficient to warrant the adoption of complete prohibition;[1]
(2) that although the experts on both sides agree that execution of the closure plan required by DEP would isolate the leachate from the well field, the prohibition prevents such execution. Accordingly, leachate from the landfill will continue as long as the placing of cover is prohibited. If, in fact, the leachate is an actual source of contamination, the regulation will perpetuate such contamination, by barring the placing of cover. In such case, the regulation, rather than protecting the public health, is furthering a threat to the public health.[2] This is hardly a proper exercise of the police power;
(3) that the landfill had been operating under a permit from DEP. The application for such a permit requires hydrogeologic and geologic studies as to the impact on water supply wells (R. 11,22a-209-4)(b)(A)(v) Conn. State Regs.) In issuing a permit, the Commissioner must determine whether the facility proposed is consistent with the Connecticut Water Quality Standards (R. 11) (22a-209-4(d)(1)(D)(2)). Absent evidence to the contrary, the Commissioner as a public officer, is presumed to perform the duties vested in him by the legislature. Balch Pontiac-Buick Inc. v. Commissioner of Motor Vehicles 165 Conn. 559, 568.
The court can find no rational basis between the prohibition in the regulation and the exercise of the police power to protect the public health.
 II.
The plaintiffs urge that the instant regulation as it applies to solid waste disposal is pre-empted by the statutory provisions relating to solid waste management and water quality. CT Page 653
The leading case on pre-emption is Shelton v. City of Shelton, 111 Conn. 433. The case dealt with the issue as to whether a municipality could prohibit the sale of raw milk when such sale was permitted by state statutes. In holding that the statute pre-empted the local ordinance, the Court noted:
 "The ordinance converts the permissive use of tuberculin-tested milk or pasteurized milk of the statute into a compulsory use. It prohibits absolutely the sale, and hence the use, of raw milk, whose use and sale the statute grants conditioned upon compliance with the statutory requirements. The ordinance repeals this statutory grant within the limits of this city. The passage of this ordinance was beyond the powers granted this city.
 The statutes as amended have covered the field of milk legislation, at least so far as the General Assembly purposed, up to the time of the passage of this ordinance. The subject-matter is not an exclusively local condition. To the extent the State legislation has gone it has preempted the field. The defendant under its general grant in 66 can aid the purposes of this legislation. It cannot override it. It cannot prohibit what the statute grants. It cannot set up new standards in place of the legislative standards. It cannot substitute its judgment for the legislative judgment. It cannot overturn a public policy evidenced in long- continued legislation over a subject statewide in its range and not only intended to conserve the health of people but certainly doing it.
 This is not the case of the ordinance speaking where the statute is silent. It is the case of a direct conflict between statutes and ordinance. They are irreconcilably inconsistent with one another. The ordinance must yield." pp. 446, 447.
The issue of pre-emption was also raised in such cases as Aaron v. Conservation Commission, 183 Conn. 532, where the plaintiff claimed that a local inland wetlands commission was without authority to regulate septic systems because the legislature had granted exclusive authority to the state public health department and DEP p. 550. The Court rejected such claim CT Page 654 noting that the grant to the health commissioner allowed him to establish minimum standards, and that requiring higher standards to protect water courses and inland wetlands was not pre-emptive. p. 551. The court further noted that it was not unusual to require permission from more than one agency. p. 552.
As the Supreme Court notes in Beacon Falls, supra, at page 582, "when a local zoning regulation irreconcilably conflicts with a state statute, the local regulation is pre-empted."
The issue of pre-emption was discussed in Dwyer v. Farrell,193 Conn. 7, with respect to the issuance of the sale of handguns.
 "There is attached to every ordinance, charter or resolution adopted by or affecting a municipality the implied condition that these state when that power has been exercised. (citation omitted). This is in keeping with our law that a municipality, as a creature of the state `can exercise only such powers as are expressly granted it or such powers as are necessary to enable it to discharge the duties and carry into effect the objects and purposes of its creation.' (citations omitted)" pp. 11, 12.
The legislature had enacted a statute (Sec. 29-28, Connecticut General Statutes) regulating the sale of handguns which required, inter alia, the obtaining of a permit from local authorities. The City of New Haven adopted an ordinance that required the seller to be a dealer and that the sale take place at a premises located in a business district or at premises where a variance had been obtained to conduct such business.
 "`Where the state legislature has delegated to local government the right to deal with a particular field of regulation, the fact that a statute also regulates the same subject in less than full fashion does not, ipso facto, deprive the local government of the power to act in a more comprehensive, but not inconsistent, manner.' Aaron v. Conservation Commission, 183 Conn. 532, 543, 441 A.2d 30
(1981). (citations omitted) Whether an ordinance conflicts with a statute or statutes can only be determined by reviewing the policy and purposes behind the statute and measuring the degree to which the ordinance frustrates the achievement of the state's objectives. (citations omitted)" p. 12. CT Page 655
 "Although the statutory pattern evinces a legislative intent to regulate the flow of handgun sales and restrict the right to sell to those establishing the requisite qualifications, it is also clear that the General Assembly anticipated that persons meeting those qualifications, including those living in residential neighborhoods and nondealers, would be permitted to sell at retail a pistol or revolver. The legislature has struck the balance between totally unregulated sales and a complete ban on sales of handguns at retail.
 In passing this handgun ordinance, the city has placed two important and substantial restrictions on the sale at retail of handguns which most residents of the city can never overcome: (1) that the seller be a dealer, and (2) that the sale occur on premises located in an area zoned as a business district. By placing these restrictions on the sale of handguns, the ordinance effectively prohibits what the state statutes clearly permit. Nor do the defendants suggest any practical means available to either plaintiff of conforming to the ordinance.
 A local ordinance is preempted by a state statute whenever the legislature has demonstrated an intent to occupy the entire field of regulation on the matter; (citation omitted) or, as here, whenever the local ordinance irreconcilably conflicts with the statute. (citations omitted). The fact that a local ordinance does not expressly conflict with a statute enacted by the General Assembly will not save it when the legislative purpose in enacting the statute is frustrated by the ordinance. Here the New Haven ordinance removes an entire class of persons as potential sellers of handguns at retail. The state permit is rendered an illusory right because a casual seller residing in a nonbusiness zone can have no real hope of ever conforming to the local ordinance. In this respect the local ordinance conflicts with the legislative intent as expressed in the applicable statutes. The city has removed a CT Page 656 right that the state permit bestows and thus has exceeded its powers." pp. 13-14.
On the issue of the legislative purpose in the area of solid waste disposal, our Supreme Court has noted:
 "In 1973 the legislature created the CRRA as part of a comprehensive program whose purpose was to address the growing statewide problems of solid waste disposal. The Solid Waste Management Services Act; General Statutes 22a-257 through 22a-281; was based on express legislative findings, inter alia that prevailing solid waste disposal practices generally, throughout the state, result in unnecessary environmental damage, waste valuable land and other resources, and constitute a continuing hazard to the health and welfare of the people of the state; that local governments responsible for waste disposal services are becoming hard pressed to provide adequate services at reasonable costs. . . [and] that the development of systems and facilities and the use of the technology necessary to initiate large-scale processing of solid wastes have become logical and necessary functions to be assumed by state government . . . . General Statutes 22a-258. The legislature further declared the policy of the state "that solid waste disposal and resources recovery facilities and projects are to be implemented either by the state of Connecticut or under state auspices. . . ." General Statutes 22a-259(2). The CRRA was created to make and implement statewide solid waste management plans; General Statutes 22a-262; subject to the authority of the Commissioner of Environmental Protection to issue permits for any solid waste disposal facility. General Statutes 22a-208.
These statutes evidence a legislative intent to commit the difficult regional problems of solid waste disposal to regional and statewide solution. The legislature could reasonably have determined that only a decision-making body with a mandate to consider the needs of more than one community could adequately balance the competing concerns of various localities within the state. . . ." Shelton v. CT Page 657
Commissioner, 193 Conn. 506, 517, 518.
In the statutes on solid waste management (Chapter 446d of the General Statutes), the Commissioner is charged with the following responsibilities.
 "Sec. 22a-208. Powers and duties of commissioner re solid waste management. (a) The commissioner shall administer and enforce the planning and implementation requirements of this chapter. He shall examine all existing or proposed solid waste facilities and provide for their proper planning, design, construction, operation monitoring, closure and postclosure maintenance in a manner which ensures against pollution of the waters of the state. . . . so that that the health, safety, and welfare of the people of the state shall be safeguarded and enhanced and the natural resources and environment of the state may be conserved, improved and protected. The commissioner shall order the alteration, extension, limitation, closure or replacement of such facilities whenever necessary to ensure against pollution of the waters of the state . . . so that the health, safety and welfare of the people of the state shall be safeguarded and enhanced and the natural resources and environment of the state may be conserved, improved and protected. . . .
In Chapter 446K of the General Statutes, the legislature has vested power in the commissioner to control by permit any discharge into the waters of the State. (Section 22a-340.) "Waters" is defined in Section 22a-423 as to include wells and underground streams, bodies or accumulations of water.
The legislature's legislative review committee (see Section4-170, Connecticut General Statutes) has approved the regulations of the Department dealing with the permitting of solid waste disposal. Such regulations require the commissioner to consider the statutes relating to water quality in issuing a permit for solid waste disposal (See Exhibit R. 11)
From the foregoing, it is clear not only that the legislature has vested power in the plaintiff CRRA to address solid waste on a regional basis, but also that the power to decide whether water discharges from a solid waste facility adversely effect a public water supply system is vested exclusively in the Commissioner of CT Page 658 environmental Protection.
Assuming, but not deciding, that the 1985 amendment to Sec.8-2, of the General Statutes, relating to the mandatory consideration of protection of groundwater, is included in the language of Section 22a-208a (b) as to the right to regulate, through zoning, land usage for solid waste disposal, it is clear that the prohibition of solid waste in the aquifer protections regulation is in direct conflict with the legislative purposes as hereinbefore described. See Bridgeport v. Stratford, 142 Conn. 634,644.
Simply put, the record shows that the defendant Commission included the banning of solid waste disposal in the district with little or no investigation as to whether there was any threat to the Oak Street well field. Conversely, the Commissioner, who is charged with enforcement of the water quality statutes, cannot issue a solid waste permit until he has carefully evaluated a wealth of scientific data supplied by the applicant; and determined the effect of such proposed operations on the water supply.
Under the provisions of Section 22a-208b of the General statutes, the Commissioner may not issue a solid waste permit without evidence of local zoning compliance. As in the Dwyer case supra, the local provision frustrates the legislative purpose, and renders the state permit illusory. Dwyer, supra at p. 14. The same premise was true in Shelton, p. 446.
The local regulations must give way.
Such cases as P.X. Restaurant Inc. v. Windsor, 189 Conn. 153, stand for the premise that local enactments, such as zoning laws may have requirements that are not overridden by a state statute. In that case, the statute provided for removal of a liquor permitted premises, taken or threatened to be taken by eminent domain. The statute (Section 30-52) permitted the department of liquor control to authorize such relocation, despite local provisions controlling distances between the liquor permit premises and such other premises as schools, churches and other institutions. In short, the statute overrode local zoning only to the extent of location and not as to other local factors as parking, size of building etc. p. 156. Such factors were not in conflict with the power exercised by the department. In contrast, the action of the defendant Commission in barring a solid waste disposal facility in an aquifer protection district is in direct conflict with the state policy, because it is based upon the consideration of public health in an area, to wit, a water discharge where the legislature has vested final authority with the Commissioner. CT Page 659
The court finds that the state statutes cited evidence a state policy that must override and preempt a purely local concern the same field and that the regulation is null and void as to the plaintiff's property.
 III.
Finally, the plaintiffs urge that the challenged regulation is not a reasonable exercise of the police power.
As noted supra, i.e. in the companion case, Wallingford first proposed zoning for an area called the borough in 1953. In 1958, Wallingford adopted town — wide zoning which the zoning enforcement officer noted was the effective date of zoning in Wallingford. The court takes judicial notice of the companion file for the following matters.
In 1953, the Zoning Regulations provided in pertinent part as follows, as to dumps:
"7.1.14 Uses permitted in I Districts shall not include, others, the following:
7.1.14.1 Garbage and refuse incineration or dumping of matter not originating on the premises, except by the Town of Wallingford."
In 1958 the regulations in pertinent part provided as follows:
"8.1.10.1 Garbage and refuse incineration or dumping of matter not originating on the premises, except by the Town of Wallingford."
Both sets of regulations were classified as cumulative, and the quoted sections refer to the least restricted district.
The Regulations adopted September 29, 1985 (R. 29) in pertinent part reads as follows:
"The Wallingford Planning and Zoning Commission, acting under authority of Chapter 124, Section 8-3, of the Connecticut General Statutes, hereby amends and codifies the Zoning Regulations, Town of Wallingford, effective November 7, 1958, as amended so that the same shall be as set forth below. The provisions of said regulations and the amendments thereto, insofar as they are consistent with these regulations, are not repealed but are codified in these regulations. Any and all provisions of said regulations as amended which are inconsistent with these CT Page 660 regulations are hereby repealed, but such repeal shall not affect any violation which occurred before these regulations (or any amendment thereof) were adopted, or exists, or any penalty incurred, nor any prosecution thereof under said regulations as amended."[3]
Sections 1.3 reads as follows, in pertinent part: ". . . nor shall any land be used . . . than as permitted in the district in which such . . . land is located. . . ."
"Solid waste disposal" is not defined in Article II "Definitions". As noted supra, the statutory definition must govern in any event.
A careful review of the 1985 Regulations as amended fails to show any provision comparable to Section 7.1 of the 1953 regulations nor to Section 8.1 of the 1958 regulations. However, Section 4.8.c.1, relating to Industrial Districts provides that in such Districts: "Garbage and refuse processing or incineration, including the generation and sale of electricity and/or steam or production of fibre in connection therewith" is permitted by special permit.
A review of the activities as presently conducted on the site and as proposed shows that such activities will not come within the purview of Section 4.8.c.1. Section 7.5 "Special Permits" provides in subsection A.2:
"2. In addition, the Commission may grant a Special Permit for a use not specifically permitted but not specifically prohibited." As noted in the defendant's brief, there is no evidence that the plaintiffs had applied for a permit under this section.
As noted supra, this court has found that the City of Meriden has established a nonconforming use for a solid waste disposal area for the 138 acre parcel (See Exhibit A at hearing on June 11, 1991). Since the non-conforming use exists independent of the regulations and their predecessors, then it must logically follow that the provisions of the Aquifer Protection District do not effect the right vested in the plaintiffs by the non-conforming use previously established.
The defendant in its brief argues that in the case of Beacon Falls v. Posick, 212 Conn. 570, our Supreme Court ruled that the authority to regulate includes the right to prohibit with respect to the enabling zoning statutes. Accordingly, it is within the i power of the defendant Commission to prohibit certain uses in the Town of Wallingford. It has done so by the aforesaid limitation of permitted uses in Sections 1.3. The prohibition of landfills, CT Page 661 other than those of the Town of Wallingford, was continued, from the prior enactment as being consistent with the new regulations. C.J.S. Zoning and Planning, 98; C.J.S. Statutes 293. See Melody v. Zoning Board of Appeals, 158 Conn. 516, 521.
Logically, the question must arise — if solid waste disposal is a use prohibited in Wallingford, what effect can the provision of Section 4.12.F.2 have on the tract owned by the plaintiff city of Meriden?
As noted supra, in Beacon Falls, citing Blue Sky Bar Inc. v. Stratford, 203 Conn. 14, 20, the power to regulate may implicate the power to prohibit. However, it has been held that the power to regulate is a power distinct and separate from the power to prohibit.
"The word `regulate' strictly interpreted, is not synonomous with "prohibit" in that it implies the continued existence of the subject matter to be regulated." Gordon v. Indianapolis,204 Ind. 79 183 N.E.2d 124, 125.
". . . the word `regulate' does not so much imply creating a new thing as arranging in proper order and controlling that which already exists." Jeschor v. Guilford, 143 Conn. 152, 159.
If the logic of the foregoing statements is followed, two propositions arise. The first is that solid waste disposal is a prohibited use in Wallingford.[4] The second, the provision sought to be removed by the plaintiffs' petition purports to regulate a use not permitted in the town, by excluding it from the Aquifer Protection District. But since the power to regulate involves the control over something in being, the regulation is a nullity because it attempts to control a use which is not permitted in Wallingford and therefore non-existent.
Since the regulations prevent a solid waste disposal facility as operated by the City of Meriden from coming into existence as a legally permitted use in Wallingford, the exclusion of such use from an aquifer protection district constitutes a futile exercise of the zoning power. Zoning power can only be exercised in order to achieve one or more of the objectives of zoning: health, safety, morals or welfare. Since this provision cannot address such an objective, it is null and void as to the plaintiff's property. Dooley v. Zoning Commission, supra.
It should further be noted that the copy of the Regulations of the Department of Environmental Protection (R. 11), defines various categories of solid wastes. These include (Sec. 22a-209-1
"Definitions"), "Special wastes", which require either more or less restrictive handling requirements than those imposed in a CT Page 662 solid waste area. Included therein is "bulky wastes", defined as land clearing debris and waste resulting directly from demolition material other than clean fill.
The Commission heard testimony from State Rep. Mary Mushinsky, a member of the Environmental Committee of the General Assembly, who urged the Commission to allow bulky waste disposal at the land fill because of the lack of threat to the public health arising from the contamination of drinking water, since bulky waste is essentially inorganic.
It should be noted that the prohibition of solid waste disposal was a blanket prohibition. There is nothing in the record to support any finding that if bulky waste disposal were allowed in the Meriden site, any pollution to the water supply would result (T. p. 38). (Testimony of Rep. Mary Mushinsky). There being no such support to require the banning of bulky waste disposal as being a threat to the public health, the total ban of all solid waste activities was in excess of the zoning power and cannot be allowed to affect the plaintiffs' property. See Dooley, supra.
In this respect, there is nothing in the record to support a finding that a total ban can be supported on a rational basis. See Beacon Falls v. Posick, 212 Conn. 570, 583, 585. Such ban fails to serve a legitimate interest, and warrants interference by the court; Clark v. Town Council, 145 Conn. 476, 482. Unlike the recent holding in Protect Hamden/North Haven from Excessive traffic and Pollution Inc. v. Planning and Zoning Commission,220 Conn. 527, 547, the commission's action in this case was site-specific. As noted in the companion case, the Commission was aware of the existence of the land fill — a parcel of 138 acres within the APD as set forth in the Plan of Development.
The appeal from the denial of the plaintiffs' application to mend the aquifer protection district regulations is sustained.
Robert P. Burns, Judge
[EDITORS' NOTE: EXHIBIT `A' IS ELECTRONICALLY NON-TRANSFERRABLE.]